# THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# CIVIL CASE NO. 3:05-CV-435-DCK

| | |
|---|---|
| RANDI IMBRIANO,<br><br>    Plaintiff,<br><br>v.<br><br>CHARLOTTE-MECKLENBURG BOARD OF EDUCATION,<br><br>    Defendant. | ORDER |

**THIS MATTER IS BEFORE THE COURT** on "Defendant's Motion for Summary Judgment" (Document No. 23) and "Brief in Support of Defendant's Motion for Summary Judgment" (Document No. 24), filed May 15, 2007; Plaintiff's "Brief in Opposition to Defendants' [*sic*] Motion for Summary Judgment and Exhibits" (Document No. 28), filed June 1, 2007; and Defendant's "Reply Brief in Support of Defendant's Motion for Summary Judgment" (Document No. 31), filed June 15, 2007. The parties consented to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c) and this matter is ripe for disposition.

Having carefully considered the record, applicable authority, and the arguments of the parties at a hearing on July 17, 2007, the undersigned will <u>grant</u> "Defendant's Motion for Summary Judgment" (Document No. 23).

## I. PROCEDURAL AND FACTUAL BACKGROUND

### A.  Background

Randi Imbriano ("Plaintiff") filed a Complaint against the Charlotte-Mecklenburg Board of Education ("Defendant") on October 13, 2005 (Document No. 1). Defendant operates Charlotte-Mecklenburg Schools ("CMS"). In her Complaint, Plaintiff alleged two claims for

relief arising from her employment with and dismissal from employment by Defendant. The First Claim for Relief was for sex discrimination and/or retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 2000e *et seq*. As part of the First Claim for Relief, Plaintiff alleged that she was discriminated against based upon her sex and dismissed by Defendant in retaliation for filing a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), both in violation of Title VII.[1] Plaintiff's Second Claim for Relief was made pursuant to the North Carolina Whistleblower Act, N.C. Gen. Stat. § 126-84, *et seq*. Plaintiff alleged that she was dismissed in retaliation for her "whistleblowing" to her superiors of alleged violations of law, fraud, and misappropriation of state resources.

Plaintiff's claims against Defendant arise from her employment as an Assistant Principal at Independence High School ("Independence"). Plaintiff was hired by Independence Principal Dr. Rick Hinson ("Dr. Hinson") as an Assistant Principal for Instruction at Independence for the 2001-2002 school year. Plaintiff remained in that position for the 2002-2003 school year, and then became an Assistant Principal at Independence for the 2003-2004 school year and the beginning of the 2004-2005 school year, before being suspended and dismissed by Defendant in Spring 2005.

**B.    Plaintiff's Problems With Substitute Teachers**

In the 2003-2004 school year, Plaintiff was the Assistant Principal responsible for administering the substitute teacher program at Independence in 2003-2004. *Imbriano Dep.*,

---

[1] The Court declines to recite the facts regarding Plaintiff's First Claim for Relief because Plaintiff voluntarily dismissed that claim with prejudice prior to the hearing and ruling on Defendant's Motion for Summary Judgment.

10:14-22, 85:18-21, 116:18-20; (*Jenkins Aff.*, ¶¶ 4-5). During that time, there were documented problems with the administration of substitute teachers and substitute teacher payroll at Independence. (*Jenkins Aff.*, ¶¶ 5, 10-12). For example, substitute teachers were allowed to work at Independence prior to completing the necessary orientation and human resources screening, resulting in substitute teachers working without being first entered into the CMS payroll system. (*Jenkins Aff.*, ¶ 5; Ex. B). Additionally, there were problems during this time with payments to substitute teachers. Plaintiff paid cash to her son, James Imbriano, after he completed a long-term substitute teacher assignment at Independence in January and February 2004, rather than handling the payment from school funds. (*Jenkins Aff.*, ¶ 11); *Imbriano Dep.*, 126:15-25.

C.  **Plaintiff's Contract Renewal and Continued Employment**

Plaintiff's problems with the administration of substitute teachers was an area of concern for Dr. Hinson during the 2003-2004 school year. Dr. Hinson included substitute teacher administration as an area for Plaintiff's improvement in her 2003-2004 mid-year assessment. (Def.'s Ex. 8). Then, on April 9, 2004, Dr. Hinson wrote Plaintiff a memorandum explaining that he would not recommend the renewal of her employment contract with Defendant at the end of the 2003-2004 school year, based in part on issues Plaintiff was having with substitute teachers and payroll. (Def.'s Ex. 9). In May 2004, CMS Assistant Superintendent for Human Resources Dr. Barbara Jenkins ("Dr. Jenkins") reviewed Dr. Hinson's concerns and recommendation not to renew Plaintiff. Despite Dr. Hinson's negative evaluations and concerns about Plaintiff's handling of substitute teachers, Plaintiff's contract with Defendant was renewed, effective August 1, 2004. (*Jenkins Aff.*, ¶ 7, Exs. D and E).

Although Defendant decided to renew Plaintiff's administrative contract following the 2003-2004 school year, Dr. Jenkins met with Plaintiff to discuss Dr. Hinson's concerns about her performance, especially with regard to substitute teachers. (*Jenkins Aff.*, ¶ 9-11). Dr. Jenkins met with Plaintiff in June 2004, at which time they discussed Dr. Hinson's evaluations of Plaintiff's performance, including his concerns about her handling of substitute teachers. (*Jenkins Aff.*, ¶ 10-11). At the meeting, Dr. Jenkins and Plaintiff discussed Plaintiff's payment to her son, Mr. Imbriano. (*Jenkins Aff.*, ¶ 11); (Imbriano Aff. ¶ 19). Dr. Jenkins told Plaintiff that it was inappropriate for her to pay substitute teachers from personal funds. (*Jenkins Aff.*, ¶ 12). Plaintiff responded by telling Dr. Jenkins that Dr. Hinson had also paid a substitute teacher from his personal funds. (*Jenkins Aff.*, ¶ 12). Dr. Jenkins then explained to Plaintiff that it was improper for anyone, including her or Dr. Hinson, to pay a substitute teacher from personal funds. (*Jenkins Aff.*, ¶ 12). Plaintiff appeared to understand that the payment of substitutes from personal funds was improper, and stated that she would not pay substitute teachers from her personal funds in the future. (*Jenkins Aff.*, ¶ 12).

### D.     The Independence Investigation

Plaintiff returned to Independence for the 2004-2005 school year as an Assistant Principal. In Fall 2004, while Plaintiff was an Assistant Principal at Independence, CMS initiated an investigation into alleged problems at Independence unrelated to Plaintiff's performance (the "Independence Investigation"). (*Jenkins Aff.*, ¶ 16-18). The Independence Investigation was initiated by Dr. Jenkins, CMS's Regional Superintendent for High Schools Ann Clark ("Ms. Clark"), and CMS legal counsel after Ms. Clark identified several irregularities at Independence in Fall 2004, including the over-reporting of student enrollment at Independence for purposes of increased funding and teacher allocation. *Clark Dep.*, 9:14-10:14;

(*Jenkins Aff.*, ¶¶ 16-18). None of the issues in the Independence Investigation related to Plaintiff. (*Jenkins Aff.*, ¶ 17). Ms. Clark, Dr. Jenkins and CMS legal counsel conducted an extensive investigation, including interviews of at least eleven Independence employees, including Dr. Hinson (Principal), each Assistant Principal (including Plaintiff), numerous teachers and other staff members. (*Jenkins Aff.*, ¶ 17). No allegations were made against Plaintiff in the Independence Investigation, and no action was taken against her as a result of the Independence Investigation. (*Jenkins Aff.*, ¶ 19). Dr. Hinson retired from CMS effective December 31, 2004, and thereafter, Plaintiff reported to Interim Principal Gary Evans. (*Jenkins Aff.*, ¶ 19).

      E.      **The Basis for Plaintiff's Dismissal**

In February 2005, Defendant initiated the dismissal process against Plaintiff, based upon Plaintiff's payment to another substitute teacher from personal funds in September 2004 and Plaintiff's handling of a student drug possession case at Independence in February 2005. Plaintiff concedes that in September 2004, she paid substitute teacher, Charles Campbell, out of her personal funds for substitute teaching he performed during the 2003-2004 school year. (*Jenkins Aff.*, ¶ 20); *Imbriano Dep.*, 106:4-23, 159:20-158:3. Plaintiff does not deny paying Mr. Campbell from personal funds, but rather, disputes that she knew it was wrong at the time. *Imbriano Dep.*, 158:11-161:11. Additionally, in February 2005 (after Dr. Hinson retired and Mr. Evans took over as Interim Principal), Plaintiff was responsible for administering discipline to a student in possession of marijuana on a school bus. (*Evans Aff.* ¶ 5); *Imbriano Dep.*, 164:14-16. Defendant contends that Plaintiff misclassified the student discipline charge, and then covered up her mistake by changing the computerized discipline records to reflect the proper charge. (*Evans Aff.*, ¶ 14). Plaintiff contends that she charged the student with the proper offense, and

then changed the offense in the computerized discipline system after Dr. Evans told her to change the offense in the system. (*Imbriano Dep.*, ¶ 26).

### F. Plaintiff's Dismissal

At the time of her dismissal, Plaintiff was a career school administrator within the meaning of the North Carolina General Statutes. *See* N.C. Gen. Stat. § 115-325(a)(1b). North Carolina statutes provide procedural rights to career administrators who may be dismissed from employment by a local board of education. *See* N.C. Gen. Stat. § 115C-325. The decision whether to initiate the dismissal process is made by the Superintendent. *See* N.C. Gen. Stat. § 115C-325(f2), (h)(2). Before recommending the dismissal of an administrator, the Superintendent must provide the administrator written notice of his intent to make such recommendation and set forth the grounds upon which he believes the dismissal is justified. N.C. Gen. Stat. § 115C-325(h)(2). The Superintendent must also meet with the administrator and give the administrator the written notice of charges against him, an explanation of the charges, and an opportunity to respond to the charges. *Id.*

Once the Superintendent provides the administrator with notice of intent to recommend dismissal, the administrator has 14 days to file a written request with the Superintendent for: (1) a hearing before a case manager on the grounds for dismissal; or (2) a hearing before the local board of education on the grounds for dismissal. N.C. Gen. Stat. § 115C-325(h)(3). If the administrator makes no request for a hearing within the 14-day period, then the Superintendent may make his recommendation to the local board of education. *Id.* The local board of education may reject, accept or modify the Superintendent's recommendation, and dismiss, demote, reinstate, or suspend the administrator without pay. *Id.*

In Plaintiff's case, the dismissal process began when Dr. Jenkins sent Plaintiff a letter on February 25, 2005, enclosing a draft of Written Notice of Charges against her based upon her payment of substitute teachers. (*Jenkins Aff*.; ¶ 22; Ex. G); (Def.'s Ex. 14). The proposed charges included: (1) insubordination for Plaintiff's payment to Mr. Campbell out of personal funds in September 2004 after being instructed not to by Dr. Jenkins in June 2004; and (2) failure to comply with state law and CMS procedure by paying substitute teachers directly out of personal funds and not withholding taxes for such payments. (*Id.*) However, based upon Plaintiff's cooperation in the Independence Investigation, Dr. Jenkins provided Plaintiff with the opportunity to accept a teaching position in lieu of dismissal from employment. (*Jenkins Aff.;* ¶¶ 22-23, Ex. G). The letter stated, "Although there are sufficient grounds for your dismissal, because of your cooperation in the investigation at Independence High School, we are willing to reassign you to a teaching position. If you agree to accept the reassignment to be a teacher, we will not then proceed with dismissal." (*Jenkins Aff.,* ¶ 22 Ex. G); (Def.'s Ex. 14). Plaintiff was also given the option to resign. (*Id.*) Plaintiff did not elect either of these options. (*Jenkins Aff.,* ¶ 23).

Around this same time, Mr. Evans, who did not know about the February 25th letter to Plaintiff, informed Dr. Jenkins of Plaintiff's falsification of student records at Independence. (*Evans Aff.*, ¶¶ 15-16). At that time, Mr. Evans had no knowledge of concerns with Plaintiff's performance, Plaintiff's alleged reports to CMS officials, or Plaintiff's involvement in the Independence Investigation. (*Evans Aff.*, ¶ 16). In fact, Mr. Evans had no contact with Plaintiff prior to him assuming the Interim Principal position in January 2005. (*Evans Aff.*, ¶ 3).

Given the seriousness of the misconduct identified by Mr. Evans, additional charges were added to the Written Notice of Charges, which were then sent to Plaintiff as Amended Written

Notice of Charges on April 8, 2005. (*Jenkins Aff.*, ¶¶ 25-26, Ex. H); (Def.'s Ex. 15). CMS Superintendent Dr. Pughsley then met with Plaintiff, and on April 21, 2005, after that meeting, Dr. Pughsley issued his Notice of Intent to Recommend Dismissal to Plaintiff. (*Jenkins Aff.*, ¶ 27; Ex. I); (Def.'s Ex. 16).

The grounds for the Notice of Intent to Recommend Dismissal were Plaintiff's conduct related to the improper payment of substitute teachers and her handling of the discipline following the School Bus Investigation, both of which were detailed in the Amended Written Notice of Charges dated April 8, 2005. (*Id.*) In the Notice of Intent to Recommend Dismissal, Dr. Pughsley offered Plaintiff the following options: (1) to resign her position with Defendant; (2) to request, within 14 days after receiving the letter, a review of the case before a case manager appointed by the State Superintendent of Public Instruction; (3) to request, within 14 days after receiving the letter, a hearing before the Board of Education; (4) to take no action, waive her right to either hearing, and allow the Board of Education to act on the Superintendent's recommendation; or (5) to resign from her position as an Assistant Principal and accept a teaching position with the Board of Education. (*Id.*)

Although represented by legal counsel throughout this time, Plaintiff took no action in response to Dr. Pughsley's Notice of Intent to Recommend Dismissal. *Imbriano Dep.*, 192:18 – 194:25; (*Jenkins Aff.,* ¶ 29). Specifically, she did not request a hearing to contest her dismissal. Thus, after Plaintiff's 14-day period to request a hearing expired, the Superintendent presented his Recommendation for the Dismissal of Plaintiff to the Board of Education, and the Board of Education voted to dismiss Plaintiff from employment for the reasons set forth in the Amended Written Notice of Charges. (*Jenkins Aff.*, ¶ 30; Exs. J & K); (Def.'s Exs. 17-18)

Plaintiff filed this lawsuit on October 13, 2005. On May 15, 2007, following a lengthy discovery period, Defendant filed the present "…Motion for Summary Judgment" (Document No. 23) and a "Brief in Support of Defendant's Motion for Summary Judgment" (Document No. 24). Defendant also filed the Affidavits of Barbara Jenkins and Gary Evans in support of its Motion for Summary Judgment. On June 1, 2007, Plaintiff filed a "Brief in Opposition to Defendants' [*sic*] Motion for Summary Judgment and Exhibits" (Document No. 28), which included the Affidavits of Randi Imbriano, Sharon Surrett and Harold Jackson. On June 15, 2007, Defendant filed a "Reply Brief in Support of Defendant's Motion for Summary Judgment" (Document No. 31). Defendant's Motion for Summary Judgment was scheduled for hearing before the Court on July 17, 2007. On the morning of July 17, 2007, prior to the scheduled hearing, Plaintiff filed a Notice of Voluntary Dismissal of the First Claim for Relief, which dismissed Plaintiff's Title VII claim *with prejudice*. (Document No. 32). After careful consideration of the papers and the arguments of counsel at a Motions Hearing, the undersigned will *grant* Defendant's motion.

## II. STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure requires that summary judgment be granted if the pleadings, responses to discovery, and affidavits, if any, establish that "there is no genuine issue as to any material fact . . . ." Fed. R. Civ. P. 56(c). As this Court has previously explained,

> Defendant as the moving party has the initial burden to show a lack of evidence to support Plaintiff's case. If this showing is made, the burden then shifts to the Plaintiff's who must convince the Court that a triable issue does exist. Such an issue will be shown "if the evidence is such that a reasonable jury could return a verdict for the [Plaintiff]."

*Boggan v. Bellsouth Telecomms., Inc.*, 86 F. Supp. 2d 545, 547 (W.D.N.C. 2000) (citations omitted).

A genuine issue of material fact exists only if a reasonable jury could return a verdict for the plaintiff on the evidence presented. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The non-moving party opposing summary judgment "may not rest upon the mere allegation or denials of his pleading, but his response ... must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. Importantly, in deciding a motion for summary judgment, the court views the evidence presented in the light most favorable to the non-moving party. That is, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

### III. DISCUSSION

**A.    Plaintiff's Voluntary Dismissal of her Sex Discrimination and Retaliation Claims Pursuant to Title VII and the Court's Supplemental Jurisdiction**

When Defendant filed its "…Motion for Summary Judgment" on May 15, 2007, Plaintiff maintained two claims for relief: (1) the First Claim for Relief was for sex discrimination and/or retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*; and (2) the Second Claim for Relief was for whistleblower retaliation pursuant to the North Carolina Whistleblower Act, N.C. Gen. Stat. § 126-84. Plaintiff conceded dismissal of her First Claim for Relief in her "Brief in Opposition to Defendants' [*sic*] Motion for Summary Judgment and Exhibits" (Document No. 28), filed on June 1, 2007. Then, on the morning of July 17, 2007, immediately prior to the Court's hearing on "Defendant's Motion for Summary Judgment," Plaintiff filed a "Notice of Voluntary Dismissal" (Document No. 32) dismissing *with prejudice* her First Claim for Relief pursuant to Title VII. After dismissing the First Claim for Relief with prejudice, Plaintiff's only remaining claim was the whistleblower claim pursuant to North Carolina state law.

At the hearing on July 17, 2007, prior to counsel's argument on Defendant's Motion for Summary Judgment, Plaintiff's counsel suggested to the Court (without making a formal motion), that the Court could remand the remaining state law claim to North Carolina Superior Court. Defendant's counsel opposed this suggestion and requested that the Court consider the matter as it had been fully briefed by the parties.

Federal district courts have supplemental jurisdiction "over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). District courts *may decline* to exercise supplemental jurisdiction over a state law claim if:

(1)     the claim raises a novel or complex issue of State law,

(2)     the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). The Court's power to decline to exercise supplemental jurisdiction over a state law claim is discretionary. *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995). "Among the factors that inform this discretionary determination are convenience and fairness to the parties, the existence of any underlying issues of federal policy, comity, and considerations of judicial economy." *Id.* In this case, the Court elected not to decline its supplemental jurisdiction, and instead, decide "Defendant's Motion for Summary Judgment" on Plaintiff's whistleblower claim. This matter had been pending before the Court since October 2005, and considerations of judicial economy and fairness to all parties weighed in favor of the Court deciding the motion on Plaintiff's state law claim

**B. Plaintiff's Second Claim for Relief Fails as a Matter of Law**

Plaintiff's Second Claim for Relief was made pursuant to the North Carolina Whistleblower Act, N.C. Gen. Stat. § 126-84, *et seq.* Plaintiff alleged that she was dismissed in retaliation for her "whistleblowing" to her superiors of alleged violations of law, fraud, and misappropriation of state resources.

To make a claim under the Whistleblower Act, Plaintiff must establish the following three elements: (1) that she engaged in a protected activity; (2) that Defendant took an adverse employment action against her; and (3) that there is a causal connection between the protected activity and the adverse action taken against Plaintiff. *Newberne v. Dept. of Crime Control & Public Safety*; 359 N.C. 782, 788, 618 S.E.2d 201, 206 (2005). Because Plaintiff has no direct evidence that the Board took adverse employment action against her because of her protected activity, Plaintiff must proceed under the burden-shifting proof scheme developed in *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Id.* at 790. Under this scheme, if a plaintiff establishes a *prima facie* case of retaliation, the defendant has the burden of articulating a lawful reason for the adverse employment action at issue. *Id.* at 791. Once the defendant makes this showing, the burden shifts back to the plaintiff to show that the defendant's proffered explanation is pretextual. *Id.*

Plaintiff has not established the *prima facie* case of whistleblower retaliation. While it is undisputed that the Board of Education's decision to dismiss Plaintiff from employment was an adverse employment action, Plaintiff cannot demonstrate that she engaged in protected activity or that there is a causal connection between her alleged protected activity and her dismissal.

### 1. *Plaintiff was not a Whistleblower*

The essence of Plaintiff's claim is that her "whistleblowing" resulted in the Independence Investigation, which ultimately led to her dismissal. However, Plaintiff's sharing of information with CMS officials prior to and during the Independence Investigation did not constitute "whistleblowing." The Independence Investigation was initiated by Dr. Jenkins, Ms. Clark, and CMS legal counsel after Ms. Clark identified several irregularities at Independence in Fall 2004. *Clark Dep.*, 9:14 – 10:12, 11:10-17. Additionally, Ms. Clark received information from numerous sources about all of the issues ultimately investigated in November and December 2004 as part of the Independence Investigation. *Id.*, 28:19 – 30:15. Moreover, it was an Independence teacher, Judy Kidd, not Plaintiff, who was the most vocal in sharing concerns about Independence. *Id.*, 11:19 – 12:17.

Moreover, by sharing information with Ms. Clark about what was happening at Independence, Plaintiff was simply doing her job as an Assistant Principal. "Simply reporting violations to superiors is not sufficient to confer whistleblower status on an individual; in fact,

this is merely part of the job description of those employed in a management position." *Tumban v. Biomerieux, Inc.*, 2007 WL 778426 slip op. at *3, n.4 (M.D.N.C. March 13, 2007). Lastly, the fact that Plaintiff gave an interview to CMS officials as part of the Independence Investigation did not make her a whistleblower. She was one of at least 11 Independence employees who were interviewed as part of that investigation. (*Jenkins Aff.*, ¶ 18). Most importantly, Plaintiff was interviewed at the request of CMS officials, Dr. Jenkins and Ms. Clark. *Imbriano Dep.*, 65:10 – 66:6; *Imbriano Aff.*, ¶¶ 18-19. In short, Plaintiff's sharing of information during the Independence Investigation cannot be characterized as that of "whistleblowing" when CMS identified the issues, initiated the investigation, and interviewed and received information from many Independence employees, including Plaintiff, about the issues of concern.

2. *There was no Causation Between Plaintiff's Alleged Whistleblowing and Dismissal*

Even assuming that Plaintiff's complaints and cooperation in the Independence Investigation constituted "whistleblowing" within the meaning of the North Carolina Whistleblower Act, there is no evidence of causation between her alleged protected activity and Defendant's decision to dismiss Plaintiff. There is no evidence in the record that Defendant (i.e., the elected Board of Education) knew anything about Plaintiff's alleged complaints and participation in the Independence Investigation. The only evidence before the Board of Education at Plaintiff's dismissal hearing was the evidence contained in the record presented by the Superintendent. (*Jenkins Aff.*, ¶ 30 & Ex. J). It included evidence of Plaintiff's payment of substitute teachers from personal funds and her alleged misclassification and subsequent cover-up in the February 24, 2005 student discipline situation. Plaintiff was dismissed solely upon that

record for the non-retaliatory reasons set forth in the Board of Education's Resolution. (*Jenkins Aff.*, ¶ 30 & Exs. J, K).

    **3.** *Defendant's Legitimate Non-discriminatory Reasons for Plaintiff's Dismissal*

Even assuming Plaintiff could make out a *prima facie* case under the North Carolina Whistleblower Act, Defendant established legitimate, non-retaliatory reasons for her dismissal. Specifically, Plaintiff paid a substitute teacher, Mr. Campbell, out of her own personal funds in September 2004 for substitute teaching he performed at Independence, contrary to Dr. Jenkins' explicit instruction in June 2004 not to do so. *Imbriano Dep.*, 157:20-158:3; (*Jenkins Aff.*, ¶ 12). Moreover, Defendant believed that Plaintiff misclassified a discipline offense in February 2005, and then attempted to cover-up her mistake by deleting and altering electronic student discipline records. The Superintendent gave Plaintiff notice of his intent to recommend her dismissal on these bases. Plaintiff chose not to contest these issues and waived her right to a hearing before a case manager or the Board of Education. Ultimately, the Board of Education considered the Superintendent's recommendation and found sufficient evidence for Plaintiff's dismissal based on her misconduct. Accordingly, Defendant provided legitimate, non-retaliatory reasons for Plaintiff's termination and shifted the burden to Plaintiff to show that these reasons were pretextual.

Plaintiff attempted to show pretext by disputing statements made by Dr. Jenkins and Mr. Evans in their affidavits. However, these disputes of fact are not material to the outcome of Defendant's Motion for Summary Judgment, because it was not Dr. Jenkins and Mr. Evans who made the decision to dismiss Plaintiff from employment with Defendant. It was the Board of Education, a group of elected individuals, who reviewed a paper record and entered a resolution

dismissing Plaintiff from employment. It is the Board of Education's decision that is subject to the pretext analysis. In this regard, the Fourth Circuit and this Court have held, that, "when an employer gives a legitimate, non-discriminatory reason for discharging the plaintiff, 'it is not [the Court's] province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination.'" *Hawkins v. Pepsico, Inc.*, 203 F.3d 274, 279 (4th Cir. 2000) (quoting *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998)); *Yanke v. Mueller Die Cut Solutions, Inc.*, 2007 WL 437694 at *8 (W.D.N.C. Feb. 5, 2007); *see also Reiterman v. Costco Wholesale*, 2006 WL 903233 (W.D.Va. 2006) (citing *Hawkins v. Pepsico, Inc.*, 203 F.3d 274, 279 (4th Cir. 2000) and *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 2999 (4th Cir. 1998)).

In *Reiterman*, the plaintiff claimed that she was terminated by Costco in retaliation for filing a charge of discrimination with the EEOC, in violation of Title VII. *Id.* at *1. The court assumed *arguendo* that the plaintiff could make the prima facie case for retaliation. *Id.* at *3. However, Costco provided a legitimate, nondiscriminatory reason for the plaintiff's termination. Specifically, Costco officials believed that the plaintiff engaged in "serious misconduct" by initiating a disruptive argument with her manager and by making inappropriate comments in the presence of customers and employees. *Id.* at *1, 3. The plaintiff disputed Costco's characterization of the events leading to her termination and disagreed with the company's decision to terminate her employment. *Id.* at *3. Nonetheless, the court granted summary judgment to Costco, holding that when analyzing an employer's decision to terminate an employee, it was not the court's province "to decide whether the reason was wise, fair, or even correct, ultimately, so long as it was truly the reason for the plaintiff's termination." *Id.* (quotations omitted). The *Reiterman* court further explained:

> Though Reiterman disputes the events of June 3, 2004, and disagrees with Costco's conclusion about her behavior, this disagreement cannot establish pretext. *The question is not how Reiterman behaved but rather Costco's perception of how she behaved.* If Costco's perception was one-sided when it terminated Reiterman, it was so because of Reiterman's admitted refusal to give her own written account.

*Id.* at *3 (emphasis added). Thus, it is the decision-maker's perception of what happened that is critical to the court's finding of pretext.

In the case at bar, Plaintiff has not put forth any sworn testimony or evidence to dispute the fact that the Board of Education dismissed her for the reasons set forth in the Board of Education's resolution dated May 24, 2005. Plaintiff was given the opportunity for a dismissal hearing before the Board of Education, pursuant to N.C. Gen. Stat. § 115C-325(h)(3). Although represented by counsel at the time, Plaintiff waived her right to a hearing before the Board of Education, at which she could have presented evidence opposing her dismissal. *Imbriano Dep.*, 192:18 – 194:25; (*Jenkins Aff.*, ¶ 29). After Plaintiff waived her right to a hearing before the Board of Education, the Superintendent, Dr. Pughsley, submitted his Recommendation for the Dismissal of Plaintiff to the Board of Education, and the Board of Education voted to dismiss Plaintiff based upon the record. (*Jenkins Aff.*, ¶ 30). The Recommendation for Plaintiff's dismissal included no mention of Plaintiff's alleged complaints to CMS officials that she describes as "whistleblowing." Moreover, the Board of Education expressly stated the legitimate, nonretaliatory reasons for Plaintiff's dismissal in its May 24, 2005 Resolution of Dismissal.

*4.* *No Jury Could Conclude that Plaintiff was Retaliated Against for her Alleged Whistleblowing*

Notwithstanding the foregoing, there is no record evidence from which a jury could conclude that Plaintiff was retaliated against for her role in the investigation. To the contrary, CMS took seriously the information provided by various sources, and based on that information, initiated the Independence Investigation to get to the bottom of some alleged irregularities. If anything, Plaintiff's cooperation in the Independence Investigation was viewed favorably by CMS, especially in light of the discipline she faced for her misconduct. On two separate occasions, Dr. Jenkins and Dr. Pughsley offered Plaintiff a teaching position in lieu of her dismissal. (*Jenkins Aff.*, ¶¶ 22-23, 28, 31); (Def.'s Exs. 14 and 16). In Dr. Jenkins' February 25, 2005 letter to Plaintiff informing her of the draft charges against her, Dr. Jenkins wrote, "Although there are sufficient grounds for your dismissal, because of your cooperation in the investigation at Independence High School, we are willing to reassign you to a teaching position." (Ex. 14).

Additionally, Plaintiff's primary claim throughout this case is that former Independence Principal Dr. Hinson retaliated against her for her alleged complaints to CMS officials. (*Compl.* ¶¶ 10-11). However, the decision to dismiss Plaintiff from employment had nothing to do with Dr. Hinson. It is true that Dr. Hinson wanted to end Plaintiff's employment in May 2004, but Dr. Jenkins decided otherwise. Plaintiff was allowed to continue as an Assistant Principal at Independence and remained in that position beyond the date Dr. Hinson retired – December 31, 2004. At the time Plaintiff falsified student discipline records, Mr. Evans had taken over as Interim Principal of Independence. (*Evans Aff.*, ¶¶ 2-3). Mr. Evans had no knowledge of any concerns with Plaintiff's performance prior to her handling of the Student Discipline Investigation. (*Evans Aff.*, ¶ 16). Moreover, Mr. Evans also knew nothing about any information Plaintiff had reported to CMS officials at any time during her employment or of her

participation in the Independence Investigation. (*Id.*) Accordingly, there is no evidence from which a jury could conclude that Plaintiff was retaliated against for her alleged whistleblowing.

## CONCLUSION

**IT IS, THEREFORE, ORDERED** that Defendant's Motion for Summary Judgment is **GRANTED** and Plaintiff's Second Claim for Relief pursuant to the North Carolina Whistleblower Act is hereby **DISMISSED WITH PREJUDICE**.

Signed: August 14, 2007

David C. Keesler
United States Magistrate Judge